**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Richard A. Williamson, on Behalf of and
as Trustee for At Home Bondholders'
Liquidating Trust,

                Plaintiff,

      v.

Verizon Communications, Inc., Verizon
Services Corp., Verizon Corporate
Resources Group LLC, Verizon Data
Services LLC, Verizon New York, Inc.,
AT&T Inc., AT&T Operations, Inc., and
AT&T Services, Inc.,

                Defendants.

No. 11 Civ. 4948 (LTS) (KNF)

**PLAINTIFF'S OPPOSITION TO AT&T INC.'S MOTION TO DISMISS**

**Table of Contents**

I.      INTRODUCTION ...........................................................................................................1

II.     STATEMENT OF FACTS ...........................................................................................1

        A.      The Undisputed Allegations In Plaintiff's Complaint Provide *Prima Facie*
                Evidence Of Personal Jurisdiction Over AT&T ...................................................... 2

        B.      AT&T Is Not A Holding Company And Its Subsidiaries that Do Business
                in New York Are Mere Departments of AT&T........................................................ 3

        C.      AT&T Failed to Meaningfully Participate in Jurisdictional Discovery................. 7

III.    STATEMENT OF LAW.............................................................................................10

IV.     ARGUMENT..............................................................................................................11

        A.      AT&T is Subject to General Jurisdiction in New York Pursuant to CPLR
                §301...................................................................................................................... 11

                1.      Common Ownership is Not in Dispute.................................................... 12

                2.      AT&T's Subsidiaries are Financially Dependent on AT&T .................. 12

                3.      AT&T Interferes in the Selection and Assignment of its
                        Subsidiaries' Executive Personnel and Does Not Observe
                        Corporate Formalities ............................................................................. 13

                4.      AT&T Controls the Marketing and Operational Policies of its
                        Subsidiaries............................................................................................. 14

        B.      Exercise of Personal Jurisdiction Over AT&T in New York Comports
                With Due Process.................................................................................................. 15

                1.      AT&T has Minimum Contacts with New York ...................................... 15

                2.      Exercise of Personal Jurisdiction Over AT&T in New York is
                        Reasonable .............................................................................................. 16

                        a.      Exercise of Personal Jurisdiction Over AT&T Will Impose
                                Little to No Burden ...................................................................... 17

                        b.      New York has a Direct Interest in Adjudicating this Case ........... 17

i

c.    Exercise of Jurisdiction Over AT&T Directly Affects
      Plaintiff's Interest in Obtaining Convenient and Effective
      Relief.............................................................................................. 17

d.    The Interstate Judicial System's Interest in Obtaining the
      Most Efficient Resolution of the Controversy ............................... 18

e.    Social Policies are a Neutral Factor in the Reasonableness
      Analysis........................................................................................... 18

V.    CONCLUSION.............................................................................................18

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bodum U.S.A., Inc. v. Hantover, Inc.*,
   11 Civ. 8702 (SAS), 2012 U.S. Dist. LEXIS 53165 (S.D.N.Y. Apr. 13, 2012) ..................... 14

*Cosmetech Int'l, LLC v. Der Kwei Enter. & Co.*,
   943 F. Supp. 311 (S.D.N.Y. 1996) ............................................................................................ 10

*Ginsberg v. Gov't Props. Trust, Inc.*,
   07 Civ. 365 (CSH) 2007 U.S. Dist. LEXIS 75771 (S.D.N.Y. Oct. 10, 2007) ............ 12, 14, 16

*Int'l Shoe Co. v. Wash.*,
   326 U.S. 310 (1945) .................................................................................................................. 15

*Kernan v. Kurz-Hastings, Inc.*,
   175 F.3d 236 (2d Cir. 1999) ..................................................................................................... 10

*Landoil Res. Corp. v. Alexander & Alexander Serv.s, Inc.*,
   918 F.2d 1039, 1043 (2d Cir. 1990) ......................................................................................... 11

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996) ........................................................................................... 15, 16, 17

*MWL Brasil Rodas & Eixos Ltda v. K-IV Enters. LLC*,
   661 F. Supp. 2d 419 (S.D.N.Y. 2009) ................................................................................ 10, 11

*San Diego County Emples. Ret. Ass'n v. Maounis*,
   749 F. Supp. 2d 104 (S.D.N.Y. 2010) ...................................................................................... 10

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
   99 Civ. 9284 (RCC), 2002 U.S. Dist. LEXIS 18440 (S.D.N.Y. Oct. 1, 2002) ........................ 12

*Stone v. Ranbaxy Pharms. Inc.*,
   No. JFM-10-cv-08816, 2011 U.S. Dist. LEXIS 64221 (S.D.N.Y. June 16, 2011) ................ 11

*Stutts v. De Dietrich Group*,
   465 F. Supp. 2d 156 (S.D.N.Y. 2006) ...................................................................................... 10

*Tivo Inc. v. AT&T Inc.*,
   Case No. 2:09-cv-259 (E.D. Tex. Sep. 17, 2010) ...................................................................... 4

*Two-Way Media LLC v. Akamai Technologies, Inc. et al.*,
   Case No. cc-8-116, slip op. at *4 (S.D. Tex. Jan. 24, 2009) .................................. 4, 12, 13, 14

iii

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
    751 F.2d 117 (2d Cir. 1984)........................................................................................12

**STATUTES/RULES**

Fed. R. Civ. P. 4(k)(1)(a) ...........................................................................................10

CPLR §301...................................................................................................................11

iv

I.    **INTRODUCTION**

AT&T Inc.'s ("AT&T's") assertion that it has "no connections to New York at all" (Defendant's Brief at 1) and is therefore not subject to personal jurisdiction here is belied by AT&T's own actions and public statements demonstrating that AT&T has strong connections to and a firm presence in New York. The material allegations in the Complaint, which have not been disputed by AT&T, along with other facts discussed below, constitute *prima facie* evidence that AT&T does business in New York, including through its subsidiaries which are mere departments of AT&T. Plaintiff has averred sufficient facts to demonstrate this Court's personal jurisdiction over AT&T and, therefore, it is respectfully submitted that AT&T's motion to dismiss should be denied.

II.   **STATEMENT OF FACTS**

The patents-in-suit cover technologies related to Internet Protocol Television ("IPTV") and, more particularly, to systems and methods for delivering video content from a high-speed network backbone to end users through a network of regional servers and caching servers which customize content received from the backbone and provide multiple levels of caching. *See* Compl. ¶ 2. AT&T is liable for infringement, inducement of infringement, and contributory infringement of the patents-in-suit vis-à-vis AT&T's IPTV service, U-verse. Compl. ¶¶ 75-77, 82-84, 89-91, and 96-98.

AT&T is a Delaware Corporation that conducts significant business in the State of New York through its subsidiaries, including through defendants AT&T Services, Inc. and AT&T Operations, Inc. Compl. ¶ 12. AT&T Services and AT&T Operations are both wholly-owned subsidiaries of AT&T and, when the Complaint was filed, both were registered to do business in New York (AT&T Services is still registered to do business in New York). Compl. ¶¶ 10-11; Ex.

1[1] at 25 (AT&T Defendants' Response to Plaintiff's First Set of Jurisdictional Interrogatories).

████████████████████████████████████████████████████████████████████████

████████████████████ *See* Ex. 1 at 25.

### A. The Undisputed Allegations In Plaintiff's Complaint Provide *Prima Facie* Evidence Of Personal Jurisdiction Over AT&T

The following facts, which were alleged by Plaintiff in its Complaint and which are not

disputed by AT&T[2], provide *prima facie* evidence of this Court's personal jurisdiction over

AT&T:

- AT&T conducts business in this district through its subsidiaries, including through AT&T Services and AT&T Operations. Compl. ¶ 20.

- AT&T actively manages and controls its global enterprise comprising the business operations of all of its subsidiaries and affiliates, including AT&T Operations and AT&T Services, and markets these services as coming from a unified entity known as "AT&T." Compl. ¶ 21.

- AT&T owns and operates a network that "covers more than 300 million people," including people in this judicial district, and provides "the broadest international access of any U.S. mobile provider." Compl. ¶ 22.

- AT&T's global networking capabilities provide advanced connections for businesses to 182 countries and on an average business day AT&T's global backbone carries nearly 24 petabytes of data traffic – more than 100 times the digitized Library of Congress. These facts are touted by AT&T in its 2010 Annual Report. *See id.*

- Also according to AT&T's 2010 Annual Report, AT&T has the United States' fastest mobile broadband network, based on independent tests, and AT&T has expanded its

---

[1]  All references herein to "Exhibits" are to the Exhibits to the Declaration of Joshua L. Raskin ("Raskin Decl.").

[2]  AT&T has not answered Plaintiff's Complaint. In addition, as discussed below in Section II.C., when given the opportunity during the limited jurisdiction-related discovery to respond to Plaintiff's jurisdiction-related allegations in the Complaint, AT&T stated ███████████████

███████████████████████████████████████████████████████████ *See* Ex. 1 at 25-
26. AT&T has therefore waived its right to deny any of these allegations at this time, *e.g.*, in its
Reply.

reach through access to more than 24,000 Wi-Fi hotspots nationwide, including in this judicial district. Compl. ¶ 23.

- AT&T Services and AT&T Operations pass their earnings upstream to AT&T, which reports those earnings as its own. For example, in its 2010 Annual Report, AT&T reported the consolidated financial results of its subsidiaries, including AT&T Operations and AT&T Services, as the results of AT&T. In the 2010 Annual Report, AT&T used the terms "we," "us," "AT&T", and "Company" to refer to both AT&T and its subsidiaries, including AT&T Operations and AT&T Services. Compl. ¶ 24.

- AT&T reported operating revenues of $124.28 billion and 266,590 employees, which includes numerous employees in New York, in its 2010 Annual Report. Compl. ¶ 25.

- AT&T's officers and directors overlap with those of its subsidiaries, AT&T Operations and AT&T Services. AT&T's 2010 Annual Report identifies Jim Cicconi as both a member of AT&T's Executive Leadership Team and as AT&T Services' Senior Executive Vice President-External and Legislative Affairs. AT&T's 2009 Annual Report identifies John Stankey as both a member of AT&T's Executive Leadership Team and as AT&T Operations' President and CEO. Compl. ¶ 26.

- AT&T is listed on the New York Stock Exchange. Compl. ¶ 27.

- AT&T directly or indirectly owns significant real property in the Southern District of New York, including the lots and buildings located at 811 Tenth Avenue and at 33 Thomas Street, both in New York City. AT&T obtained these properties from AT&T Corp. in 2006. Compl. ¶ 28.

- AT&T has availed itself of the New York Courts by asserting counterclaims in at least the following actions in the Southern District of New York: *The Famer's Telephone Company of Richville, Iowa, Inc. et al. v. AT&T Inc.*, Case No. 1:07-cv-00859; *All American Telephone Company, Inc. et al. v. AT&T, Inc.*, Case No. 1:07-cv-00861; and *Aventure Communication Technology, L.L.C. v. AT&T, Inc.*, Case No. 1:07-cv-01780. Compl. ¶ 29.

**B.      AT&T Is Not A Holding Company And Its Subsidiaries that Do Business in New York Are Mere Departments of AT&T**

AT&T is not a holding company as it asserts in its moving papers (*see* Threlkeld Decl.,

¶¶ 3-7), and its subsidiaries doing business in New York are merely departments of AT&T.

AT&T is therefore subject to general jurisdiction in New York. As discussed below, the initiative

to launch the accused U-verse product was a major undertaking that required enormous

investment, as well as decision-making, coordination, and oversight from the highest levels of

3

AT&T's corporate hierarchy, *i.e.*, by AT&T itself, and was not an independent undertaking by any particular subsidiary operating in a narrow geographic area.

Several Courts have already rejected AT&T's attempts to avoid liability for its U-verse product on grounds that it is a holding company. In *Two-Way Media LLC v. Akamai Technologies, Inc. et al.*, Case No. cc-8-116 (S.D. Tex), Chief District Judge Head denied AT&T's motion for summary judgment that it could not be liable for direct infringement based only on the infringing acts of its subsidiaries. *See id.*, slip op. at *4 (S.D. Tex. Jan. 24, 2009) (Ex. 2). Judge Head pointed out that, according to testimony from Jeff Weber, Vice President of Product and Strategy at AT&T Operations, AT&T's senior officer, John Stankey, "was intimately involved in and responsible for various aspects of the U-verse project including product development, engineering, funding, and marketing," and that "the parent company [*i.e.*, AT&T Inc.] makes all the ultimate decisions."[3] *Id.*

Similarly, in *Tivo Inc. v. AT&T Inc.*, Case No. 2:09-cv-259 (E.D. Tex. Sep. 17, 2010), the Court rejected AT&T's assertion that it "is only a holding company and does not perform any cognizable act of patent infringement" and was therefore "peripheral" to TiVo's claims, finding that such an assertion "[amounts] to a determination that AT&T Inc.'s acts can be completely divorced from the accused [U-verse] devices." *See id.*, slip op. at *3-5 (Ex. 4).

AT&T's public statements also belie any assertion that AT&T performs no direct role in providing its services to the public and that it is merely a holding company. For example, in a December 20, 2007 letter to the Federal Communications Commission ("FCC"), Jacquelyne

---

[3] Mr. Stankey's overlapping role with AT&T Inc. and AT&T Operations Inc. is also noted in the Complaint. Mr. Stankey is currently identified by AT&T as "Group President and Chief Strategy Officer, AT&T Inc." Ex. 3 (Executive Bios – John T. Stankey, http://www.att.com/gen/investor-relations?pid=9816).

Flemming, Executive Director -- Federal Regulatory, of AT&T Services, Inc. stated in no uncertain terms that AT&T was the driving force behind the announcement, launch, and operation of AT&T's U-verse product:

> In June 2004, SBC Communications Inc., *now AT&T Inc. ("AT&T")*, announced it would develop a network capable of delivering a new generation of integrated digital television, high-speed broadband, and VoIP services to its residential and small-business customers. In December 2005, *AT&T* launched U-verse, a state-of-the-art, IP-based video service, in San Antonio, and in 2006 *AT&T* began deploying the service in other markets throughout its 13-state in-region territory. In 2007, *AT&T* ramped up its deployment of U-verse in its 13-state region dramatically, while also making substantial progress in bringing U-verse to its new customers in the former BellSouth in-region territory.

Ex. 5 at 1 (December 20, 2007 Letter to Federal Communications Commission) (emphasis added).

In addition, Matthew Wallace, an AT&T employee, submitted a declaration in November 2007 to the FCC ████████████████████████████████████████ (*see* Ex. 1, at 16, 37, and 38[4]) and that AT&T is merely a holding company:

> I am employed *by AT&T, Inc. ("AT&T")* as Executive Director – Advanced Access Technologies . . . In my current capacity, I am responsible for all network integration aspects of U-Verse TV service, *AT&T's* Internet Protocol ("IP") video service offering, including technical requirements, architecture, testing, and first office applications.

Ex. 8 at ¶¶ 1-2 (Decl. of Matthew Wallace before the FCC, dated Nov. 14, 2007) (emphasis added).

AT&T has also represented to the Securities and Exchange Commission ("SEC") and its shareholders that it controls, and invests heavily in, its U-verse system:

---

[4] Plaintiff's attempt to clarify AT&T's position was ignored by AT&T. *See* Ex. 6 at p. 4; Ex. 7.

5

- AT&T's 2010 10-K SEC filing defines "we" as "AT&T Inc." and states "[w]e are continuing to expand our deployment of U-verse services." Ex. 9 at 2 (AT&T Inc. 10-K, filed Feb. 25, 2010).

- In its 2006 Annual Report, AT&T stated the following: "Our high speed broadband has opened the door to a new opportunity – video . . . Delivered over an expanded fiber network, AT&T U-verse TV service is state of the art. … [I]n 2007, we plan to expand AT&T U-verse availability and add new features." Ex. 10 at 2 and 11.[5]

- In its 2007 Annual Report, AT&T stated that "AT&T is building the fastest Internet backbone in the U.S., and we are the only major U.S. communications company deploying a pure, 100 percent IP video network. Our next-generation AT&T U-verse[SM] service – which delivers interactive TV, broadband and voice – ramped throughout 2007 to more than 231,000 TV customers. We expect to end 2008 with more than 1 million U-verse TV customers and to expand our network deployment to 30 million customer locations by the end of 2010." Ex. 11 at 4 and 15.

- In its 2008 Annual Report, AT&T stated the following: "We continued to invest in fixed-line broadband, launching a new 18-megabit-per-second broadband service in several U.S. markets where we've deployed our U-verse network. … To support our customers' growing desire to access data, software applications and video at higher speeds, we completed the world's largest deployment of 40-gigabit-per-second transport – the fastest available Internet backbone technology – across our entire U.S. network." Ex. 12 at 4.

- In its 2009 and 2010 Annual Reports, AT&T stated the following: "We expect to continue to expand our U-verse service offerings in 2010/2011." Ex. 13 at 41 and Ex. 14 at 40.

---

[5] AT&T omits the names of its subsidiaries in each of its Annual Reports, defining "we," "AT&T," and "Company" to mean AT&T Inc., further demonstrating that those subsidiaries are mere departments of AT&T. *See* Ex. 10 at 51 (AT&T Inc. 2006 Annual Report, http://www.att.com/Investor/ATT_Annual/2006/downloads/ATT_2006_Annual_Report.pdf), Ex. 11 at 27 (AT&T 2007 Annual Report, http://www.att.com/Investor/ATT_Annual/downloads/07_ATTar_FullFinalAR.pdf), Ex. 12 at 23 (AT&T 2008 Annual Report, http://www.att.com/Common/about_us/annual_report/pdfs/2008ATT_FullReport.pdf), Ex. 13 at 31 (AT&T Inc. 2009 Annual Report, http://www.att.com/Common/about_us/annual_report/pdfs/ATT2009_Full.pdf), Ex. 14 at 31 (AT&T Inc. 2010 Annual Report, http://www.att.com/Common/about_us/annual_report/pdfs/ATT2010_Full.pdf) and Ex. 15 at 31 (AT&T Inc. 2011 Annual Report, http://www.att.com/Common/about_us/files/pdf/ar2011_annual_report.pdf).

- In its 2011 Annual Report, AT&T stated the following: "In 2011, we reached our build-out target of more than 30 million living units for our award-winning video service AT&T U-verse® TV. Launched in 2006, U-verse is now a nearly $7 billion revenue stream for us . . . In 2012, we'll continue to bring U-verse services to more families and businesses and to enhance the U-verse experience with new features." Ex. 15 at 11.

AT&T's direct control over its products and services is not limited to U-verse. AT&T's Annual Reports make similar statements with regard to AT&T's other services, including its wireless services, which are offered and sold nationally including in this District. *See* Ex. 10 at 4-9, Ex. 11 at 3-4 and 8-11, Ex. 12 at 2-5 and 7-19, Ex. 13 at 1-3, 7-12, and 15-18, Ex. 14 at 1-10, and Ex. 15 at 1-21.

AT&T has submitted a declaration to the FCC that also contradicts AT&T's assertions that it has no employees and highlights AT&T's direct control at the highest corporate level over its wireless services and products offered in this District. *See* Ex. 16 (Decl. of Rick Moore, Senior Vice President, AT&T Inc., dated Nov. 21, 2008) (describing the expected effects of a proposed acquisition by AT&T of Centennial Communications, including "expanding AT&T's wireless footprint and reducing roaming costs [for AT&T's subscribers].").

AT&T admits that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 1 at 34), indicating that AT&T is more than just a holding corporation, and exercises ultimate financial control over the wireless services and products offered by its subsidiaries.

### C.    AT&T Failed to Meaningfully Participate in Jurisdictional Discovery

Following the initial filing of AT&T's motion, the parties agreed to engage in jurisdictional discovery which, at the outset, would be limited to a single set of interrogatories. *See* Raskin Decl. at ¶ 2. The hope was that AT&T's responses to those interrogatories would

obviate the need for document discovery and depositions. *See id.* However, AT&T's responses

were rife with attorney objections and lacking in meaningful information. *See id.* For example,

Plaintiff's interrogatory 3 asked AT&T to admit or deny certain allegations in the Complaint,

including whether:

- AT&T directly or indirectly owns significant real property in this district, including the lots and buildings located at 811 Tenth Avenue and at 33 Thomas Street;

- AT&T is listed on the New York Stock Exchange; and

- AT&T has availed itself of the New York Courts by asserting counterclaims in at least the following actions in the Southern District of New York: *The Farmers' Telephone Company of Richville, Iowa, Inc. et al. v. AT&T Inc.,* Case No. 1 :07-cv-00859; *All American Telephone Company, Inc. et al. v. AT&T, Inc.,* Case No. 1 :07-cv-00861; and *Aventure Communication Technology, L.L.C. v. AT&T, Inc.,* Case No. 1 :07-cv-01780.

Instead of simply admitting or denying these basic facts, as well as those noted in Section

II.A. above, facts which are both easily ascertainable and directly relevant to AT&T's motion to

dismiss, AT&T stated that ████████████████████████████████

████████████████████████████████████ Ex. 1 at 26.

When AT&T's counsel was questioned during a meet-and-confer on January 5, 2012, they were

incapable of providing any justification for their gross deficiencies. *See* Raskin Decl. at ¶ 3.

In addition to refusing to provide substantive responses to many of Plaintiff's

interrogatories, AT&T also made materially false statements in its responses. *See* Raskin Decl. at

¶ 4. Interrogatory 14 asked AT&T to describe any research and development conducted by

AT&T regarding IPTV (the technology at issue in this case) in the State of New York, or within

100 miles of the Southern District of New York, including in AT&T facilities in New Jersey. *See*

*id.* In response, AT&T stated that:



Ex. 1 at 39.

However, information gathered by Plaintiff from public sources demonstrates this statement to be false. *See* Raskin Decl. at ¶ 5. As Plaintiff pointed out to AT&T in its January 4, 2012 letter (Ex. 5), numerous research papers regarding IPTV have been published by AT&T Labs in New Jersey, some of which identify AT&T U-verse by name. *See id.*

Many of AT&T's responses were also evasive. *See* Raskin Decl. at ¶ 6. For example, Plaintiff's interrogatory 15 asked AT&T to describe any plans to offer U-verse to customers in New York State. *See id.* Rather than either stating that it has no such plans or otherwise describing the nature of any such plans, AT&T responded by stating that ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 at 40. When challenged on this point in Plaintiff's January 4 letter, AT&T responded that the request seeks "highly-sensitive competitive and business information regarding prospective business plans" and that determining a response would "require conversations with nearly all high-level AT&T employees, including all officers and directors." *See* Ex. 5 at 2-3. Whether AT&T has plans to introduce the accused U-verse services to customers in New York is, however, a simple and straightforward question that AT&T has yet to answer.

Because of AT&T's incomplete and evasive interrogatory responses, Plaintiff requested that AT&T produce a corporate representative for a deposition on the issues raised by Plaintiff's interrogatories. *See* Raskin Decl. at ¶ 7. However, AT&T declined. *See id.*

Accordingly, Plaintiff has only been able to take limited jurisdictional discovery in this case, comprising only incomplete and evasive responses to a single set of interrogatories. *See* Raskin Decl. at ¶ 8. Plaintiff has received no documents and has not taken any depositions on jurisdiction-related issues. *See id.*

## III. STATEMENT OF LAW

It is the plaintiff's burden to establish personal jurisdiction over a defendant on a motion to dismiss under Rule 12(b)(2). *See Stutts v. De Dietrich Group*, 465 F. Supp. 2d 156, 159 (S.D.N.Y. 2006). Although the plaintiff must ultimately establish jurisdiction by a preponderance of the evidence, if only limited jurisdictional discovery has been conducted, but no evidentiary hearing has taken place, a plaintiff "need only offer *prima facie* evidence of personal jurisdiction" to defeat a 12(b)(2) motion to dismiss. *Cosmetech Int'l, LLC v. Der Kwei Enter. & Co.*, 943 F. Supp. 311, 317 (S.D.N.Y. 1996) (citing *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197-98 (2d Cir. 1990)); *see also Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999). Furthermore, "[w]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *San Diego County Emples. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 116 (S.D.N.Y. 2010) (quoting *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993)).

A court may exercise personal jurisdiction over any defendant "who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." *See* Fed. R. Civ. P. 4(k)(1)(a). Courts follow a two-step process to determine whether personal jurisdiction exists. *See MWL Brasil Rodas & Eixos Ltda v. K-IV Enters. LLC*, 661 F. Supp. 2d 419, 423 (S.D.N.Y. 2009). First, the Court decides whether a statutory basis exists under the law of the forum, here New York Civil Practice Law and Rules ("C.P.L.R"). *See id.* If

10

a statutory basis exists, the Court must consider whether the exercise of such jurisdiction comports with the requirements of due process. *Id.*

## IV.   ARGUMENT

The undisputed facts in the record constitute more than *prima facie* evidence of personal jurisdiction over AT&T in this District. The facts demonstrate that, through its subsidiaries, including defendants AT&T Services and AT&T Operations, which are mere departments of AT&T, AT&T does business in this district thereby subjecting it to the general jurisdiction of this Court. Compl. ¶¶ 20-29.

### A.   AT&T is Subject to General Jurisdiction in New York Pursuant to CPLR §301

CPLR § 301 permits the exercise of general jurisdiction over a foreign corporation "doing business" in New York if the corporation is "present in New York not occasionally or casually, but with a fair measure of permanence and continuity." *See Landoil Res. Corp. v. Alexander & Alexander Serv.s, Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990). The test is a pragmatic one and is necessarily fact-sensitive. *Id.* at 1043. Where the claim is that a foreign corporation is present in New York because of the activities of a subsidiary within the state, the subsidiary must be either an "agent" or a "mere department of the foreign parent. *Stone v. Ranbaxy Pharms. Inc.*, No. JFM-10-cv-08816, 2011 U.S. Dist. LEXIS 64221, at *5 (S.D.N.Y. June 16, 2011) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998)). To demonstrate that a subsidiary is a "mere department," Courts consider the following four factors:

> (1) common ownership; (2) financial dependency of the subsidiary on the parent organization; (3) the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and (4) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.

11

*See SEB S.A. v. Montgomery Ward & Co., Inc.*, 99 Civ. 9284 (RCC), 2002 U.S. Dist. LEXIS 18440, at *8 (S.D.N.Y. Oct. 1, 2002) (citing *Jazini*, 148 F.3d at 184). The first factor, common ownership, is essential. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). Courts balance the remaining factors to determine whether the subsidiary acts "as a separate and independent entity." *Ginsberg v. Gov't Props. Trust, Inc.*, 07 Civ. 365 (CSH), 2007 U.S. Dist. LEXIS 75771, at *13 (S.D.N.Y. Oct. 10, 2007).

### 1.   Common Ownership is Not in Dispute

It is not in dispute that AT&T Operations and AT&T Services,



(*see* Ex. 1 at 25), are wholly-owned subsidiaries of AT&T. Therefore, the "common ownership" factor of the "mere department" test has been satisfied. As to the remaining three factors, they must be balanced to determine whether AT&T's subsidiaries act as separate and independent entities or, instead, whether AT&T actively manages and controls their business so that they are "mere departments" of AT&T.

### 2.   AT&T's Subsidiaries are Financially Dependent on AT&T

AT&T  *See* Ex. 1 at 34

AT&T's subsidiaries are therefore financially dependent on AT&T which, according to AT&T Operations, "makes all the ultimate decisions." *See Two-Way Media*, Case No. cc-8-116, slip op. at *4 (S.D. Tex. Jan. 24, 2009).

AT&T reports the earnings of its subsidiaries, including AT&T Services and AT&T Operations, as its own. Compl. ¶ 24. For example, AT&T reported operating revenues of $124.28 billion in its 2010 Annual Report, in which it used the terms "we," "us," "AT&T," and

"Company" to refer to both AT&T and its subsidiaries. *Id.* AT&T owns and operates network systems that are immense in scope and capability (*see* Compl. ¶¶ 22-23) and such systems have required tremendous investment, decision-making, coordinating, and oversight from the highest levels of AT&T's corporate hierarchy, *i.e.* by AT&T itself. *See* Section II.B, above. Indeed, as explained by an employee of AT&T Operations, AT&T's senior officers have been "intimately involved in" and "responsible" for funding AT&T's nation-wide services which are provided by AT&T's subsidiaries, including AT&T Operations and AT&T Services. *See Two-Way Media*, Case No. cc-8-116, slip op. at *4 (S.D. Tex. Jan. 24, 2009).

Accordingly, *prima facie* evidence exists that AT&T Services and AT&T Operations are financially dependent on AT&T and do not act as separate and independent entities.

### 3.   AT&T Interferes in the Selection and Assignment of its Subsidiaries' Executive Personnel and Does Not Observe Corporate Formalities

John Stankey, an employee of *both* AT&T and AT&T Operations, "was intimately involved in and responsible for various aspects of the U-verse project including product development, engineering, funding, and marketing." *Two-Way Media*, at *4. AT&T Operations admits that AT&T "makes all the ultimate decisions." *Id.* In addition, AT&T's 2010 Annual Report identifies Jim Cicconi, a senior executive for AT&T Services, Inc., as a member of AT&T's Executive Leadership Team (Compl. ¶ 26),  ████████████████████████  Ex. 1 at 26. This overlap of senior executives demonstrates AT&T's active involvement in the selection and assignment of the executive personnel of its subsidiaries.

AT&T actively manages and controls the business operations of all of its subsidiaries, including AT&T Operations and AT&T Services which are subject to personal jurisdiction in New York (*see* Compl. ¶ 21). AT&T claims the success of its network systems and products as

13

its own and reports its subsidiaries' employees as its own (*see* Compl. ¶¶ 22-24). AT&T is also represented by the same New York counsel as AT&T Services and AT&T Operations, which "evidences a role of the parent in the day-to-day operations of the subsidiaries ... [and] provides another example of common personnel within, and the shifting of personnel among, the corporations." *Ginsberg*, 07 Civ. 365 (CSH) (ECF), 2007 U.S. Dist. LEXIS 75771, at *27-28 (quoting *Knapp v. Consol. Rail Corp.*, 89-cv-1034S, 1992 U.S. Dist. LEXIS 10969, at *5 (W.D.N.Y. 1992)).

Moreover, AT&T itself owns real property in New York City at 811 Tenth Avenue and at 33 Thomas Street (Compl. ¶ 28). *See, e.g., Bodum U.S.A., Inc. v. Hantover, Inc.*, 11 Civ. 8702 (SAS), 2012 U.S. Dist. LEXIS 53165, at *7 (S.D.N.Y. Apr. 13, 2012) ("To determine whether a foreign corporation is doing business in New York, courts focus on criteria including: . . . whether it has any bank accounts or other property in the state.").

Accordingly, *prima facie* evidence exists that AT&T interferes in the selection and assignment of its subsidiaries' executive personnel and fails to observe corporate formalities such that its subsidiaries do not act as separate and independent entities.

### 4. AT&T Controls the Marketing and Operational Policies of its Subsidiaries

As discussed above, AT&T "makes all the ultimate decisions" related to its subsidiaries' services. *See Two-Way Media*, at *4. Its executives have been "intimately involved in and responsible for" issues such as "product development, engineering, funding, and marketing" of the services provided by AT&T and its subsidiaries. *Id.* According to AT&T Services, AT&T was responsible for announcing, launching, and deploying the U-verse system for which AT&T Operations and AT&T Services provide services. *See* Ex. 5 at 1. Similarly, AT&T has explained

to the FCC that its employees are responsible for the implementation of the U-verse system. *See* Ex. 8 at ¶¶ 1-2. AT&T has also submitted declarations to the FCC that highlight AT&T's direct control over its wireless services and products (*see* Ex. 16), which are offered by AT&T and its subsidiaries in this District. Indeed, central control over the investment, decision-making, coordinating, and oversight from the highest levels of AT&T's corporate hierarchy, *i.e.* by AT&T itself, was necessary for AT&T and its subsidiaries to create and market its large-scale systems such as U-verse and AT&T wireless and mobile broadband services. *See* Section II.B., above.

Accordingly, *prima facie* evidence exists that AT&T controls the marketing and operational policies of its subsidiaries and that they do not act as separate and independent entities.

AT&T is not merely a holding corporation that does no business in New York, but exercises actual and ultimate control over the activities of its subsidiaries in New York, and claims credit for their business in New York. These subsidiaries are therefore mere departments of AT&T, making AT&T subject to this Court's personal jurisdiction.

### B. Exercise of Personal Jurisdiction Over AT&T in New York Comports With Due Process

The due process test for personal jurisdiction has two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

### 1. AT&T has Minimum Contacts with New York

AT&T has "certain minimum contacts with [New York] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*,

326 U.S. 310, 316 (1945). As demonstrated above, AT&T has a presence in New York through

its management of, control over, and close ties with its subsidiaries. AT&T also owns real

property in New York and is listed on the New York Stock Exchange. *See Ginsberg*, 07 Civ. 365

(CSH)(ECF), 2007 U.S. Dist. LEXIS 75771 at *46 (concluding that defendant had requisite

contacts with New York based, in part, on "its listing on the New York Stock Exchange" to

satisfy constitutional due process). AT&T has also asserted counterclaims in several cases in this

District. Compl. ¶ 29. These facts, including others discussed above, demonstrate that AT&T has

"purposefully availed itself of the privilege of conducting activities" in New York such that

AT&T "should reasonably anticipate being haled into court [here]." *Ginsberg*, 07 Civ. 365

(CSH)(ECF), 2007 U.S. Dist. LEXIS 75771, at *46 (quoting *Burger King Corp. v. Rudzewicz*,

471 U.S. 462, 474, 475 (1985)).

## 2.   Exercise of Personal Jurisdiction Over AT&T in New York is Reasonable

The assertion of personal jurisdiction over AT&T in New York comports with

"traditional notions of fair play and substantial justice" – that is, it is reasonable under the

circumstances of this particular case. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84

F.3d 560, 568 (2d Cir. 1996) (quoting *Int'l Shoe*, 326 U.S. at 316). Court consider the following

factors as part of the "reasonableness" analysis: (1) the burden that the exercise of jurisdiction

will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the

plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's

interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest

of the states in furthering substantive social policies. *Id.* (citations omitted).

16

### a.   Exercise of Personal Jurisdiction Over AT&T Will Impose Little to No Burden

Exercise of personal jurisdiction over AT&T in this case will impose little burden on AT&T. AT&T has already participated in discovery and commenced claim construction procedures. *See* Raskin Decl. at ¶ 9. In fact, fact discovery is only three months from completion. *Id*. In addition, as discussed in Plaintiff's opposition to AT&T Operations' and AT&T Services' motion to sever and transfer, this is the appropriate forum for the adjudication of Plaintiff's claims against AT&T's subsidiaries (*see* Plaintiff's Opposition to Defendants' Motion to Sever and Transfer, at 13-20), whose shared counsel with AT&T will already be representing AT&T's subsidiaries in New York. Therefore, the exercise of jurisdiction over AT&T in New York will impose little burden on AT&T and is reasonable.

### b.   New York has a Direct Interest in Adjudicating this Case

Plaintiff is the trustee for the At Home Bondholders' Liquidating Trust and is a New York resident. New York has an interest in guaranteeing that the rights of its citizens are adequately protected. *Metropolitan Life*, 84 F.3d at 574. New York, therefore, has a direct interest in adjudicating this case.

### c.   Exercise of Jurisdiction Over AT&T Directly Affects Plaintiff's Interest in Obtaining Convenient and Effective Relief

Plaintiff filed its complaint against AT&T and Verizon together in New York, *see* Compl. ¶¶ 1-3, and jurisdiction over Verizon has not been disputed. *See* Raskin Decl. at ¶ 10. It is also respectfully submitted that Plaintiff's case against AT&T Operations, Inc. and AT&T Services, Inc. should be adjudicated here in New York. *See* Plaintiff's Opposition to Defendants' Motion to Sever and Transfer, at 13-20. Requiring Plaintiff to litigate its claim against AT&T in

a separate forum would cause significant inconvenience to Plaintiff. It would increase the chances of obtaining inconsistent rulings from different courts in related cases, thereby negatively affecting Plaintiff's ability to obtain convenient and effective relief. Therefore, this factor also supports the conclusion that this Court's exercise of jurisdiction over AT&T is reasonable.

> **d.      The Interstate Judicial System's Interest in Obtaining the Most Efficient Resolution of the Controversy**

As discussed in Plaintiff's opposition to AT&T Operations' and AT&T Services' motion to sever and transfer, judicial economy will be furthered by adjudicating common issues of fact and law relating to infringement by AT&T and Verizon in this forum. *See* Plaintiff's Opposition to Defendants' Motion to Sever and Transfer, at 13-20. Therefore, this factor also supports the conclusion that this Court's exercise of jurisdiction over AT&T is reasonable.

> **e.      Social Policies are a Neutral Factor in the Reasonableness Analysis**

This factor does not favor either party in an assessment of the reasonableness criteria.

Accordingly, New York's exercise of jurisdiction over AT&T is reasonable and comports with due process.

## V.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that AT&T's motion to dismiss should be denied.

Dated: May 1, 2012                       BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

                                         /s/  Joshua  L. Raskin              .
                                         Joshua L. Raskin (JR-4613)
                                         Paul Hyun (PH-9277)
                                         Eric Bitzegaio (EB-1024)

1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Joshua@blbglaw.com
Eric@blbglaw.com
Phone: (212) 554-1400
Fax: (212) 554-1444

BEIRNE, MAYNARD & PARSONS, LLP

William C. Norvell, Jr. (admitted *pro hac vice*)
Scott D. Marrs (admitted *pro hac vice*)
1300 Post Oak Blvd., Suite 2500
Houston, Texas  77056-3000
Phone: (713) 623-0887
Fax:  (713) 960-1527

*Attorneys for Richard A. Williamson, on behalf
of and as Trustee for At Home Bondholders'
Liquidating Trust*

19