**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD A. WILLIAMSON, ON BEHALF OF AND AS TRUSTEE FOR AT HOME BONDHOLDERS' LIQUIDATING TRUST <br><br> Plaintiff, <br><br> v. <br><br> VERIZON COMMUNICATIONS INC., VERIZON SERVICES CORP., VERIZON CORPORATE RESOURCES GROUP LLC, VERIZON DATA SERVICES LLC, VERIZON NEW YORK INC., AT&T INC., AT&T OPERATIONS, INC., AT&T SERVICES, INC., <br><br> Defendants. | CIVIL ACTION <br><br> ECF CASE <br><br> Civil Action No. 1:11-cv-04948 (LTS)(HBP) |

**DEFENDANTS' POST-*MARKMAN* HEARING CLAIM CONSTRUCTION BRIEF**

TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT ........................................................................................................2

        A.      "Caching" Requires More Than Just Mere Storage – It Requires the Capability to Handle Requests for Content Not Stored in that Location ......................................2

                1.      The Intrinsic Evidence Supports Defendants' Construction .......................3

                2.      The Extrinsic Evidence Overwhelmingly Confirms That Defendants' Proposal Is Correct................................................................4

        B.      Replication of Content "*Amongst* the Regional Servers" – Not "To" or "Onto" the Regional Servers.........................................................................................5

        C.      In the Context of the Invention, "Content" Means "Public Network-Accessible Files".......................................................................................................8

                1.      The Intrinsic Evidence Supports Defendants' Construction .......................8

                2.      Plaintiff's Attempts to Rebut Defendants' Construction Are Meritless .............................................................................................10

        D.      The Construction of "Multicast[ing]" Should Not Cover Broadcasting ..............12

                1.      Plaintiff Has Admitted That Multicast Is Distinct From Broadcast ..........................................................................................12

                2.      Recipients' Requests to Join Multicast Groups Distinguish Multicast From Broadcast .......................................................................13

        E.      "Destination Address" Identifies a Multicast Group.............................................15

        F.      "Group of [the] End User Systems" Refers to End User Systems that Requested the Content..................................................................................................16

III.    CONCLUSION ...................................................................................................17

Defendants AT&T Operations, Inc., and AT&T Services, Inc. (collectively "AT&T"), and Verizon Communications Inc., Verizon Services Corp., Verizon Corporate Resources Group LLC, Verizon Data Services LLC and Verizon New York Inc. (collectively "Verizon"), (AT&T and Verizon collectively referred to herein as "Defendants") submit this Post-*Markman* Hearing Claim Construction Brief in support of their proposed constructions for the disputed terms in U.S. Patent Nos. 6,370,571 ("the '571 Patent"), 7,225,275 ("the '275 Patent"), 7,529,856 ("the '856 Patent") and 7,873,749 ("the '749 Patent") (collectively, the "patents-in-suit").

## I.    INTRODUCTION

This Court held a *Markman* hearing on the disputed claim terms of the patents-in-suit on December 10, 2012.  As the Court instructed the parties at the close of the hearing, Defendants provide proposed claim constructions and evidence in support of those constructions consistent with the arguments and evidence presented at the *Markman* hearing.[1]  Defendants' proposed constructions capture the plain ordinary meaning of the relevant terms as they would be understood by one of ordinary skill in the art reviewing the intrinsic evidence, and those constructions are further confirmed by the extrinsic evidence.   In contrast, Plaintiff's constructions rely on attorney argument and are unsupported by—and in some instances contradict—the evidence of record and their own arguments to the Court.  Defendants' proposed constructions should be adopted.

---

[1] A copy of Defendants' slide presentation from the *Markman* hearing is attached hereto as Exhibit A to the Declaration of Jennifer C. Tempesta in Support of Defendants' Post-*Markman* Hearing Claim Construction Brief.

## II.   ARGUMENT

**A.   "Caching" Requires More Than Just Mere Storage – It Requires the Capability to Handle Requests for Content Not Stored in that Location**

For the "caching" terms, the parties fundamentally agree on the two basic issues: (1) that the "first level" and "second level" portions of the disputed phrases require a hierarchy, and (2) that caching requires more than just a storage location.  *See, e.g.,* 12/10/12 Hrg. Tr. at 11:9-14. The question for the Court is how best to capture those two concepts with terminology that will be meaningful and helpful to a jury deciding questions of infringement and validity.

Defendants propose constructions, shown in the chart below, that leverage off of the Court's tentative claim constructions.  Defendants presented these proposals at the hearing.

As Defendants stated at the hearing*,* the Court's proposed constructions properly capture the hierarchical relationship called out by the first and second levels of these terms, but do not capture the essential feature of caching—that it be more than merely storage and be capable of handling requests for content not presently stored in the cache.  The proposal below succinctly captures both concepts (bolded, italicized material added to Court's preliminary proposed construction).

| Term to be Construed | Defendants' Proposed Construction |
|---|---|
| provid[ing/e] a first level of caching [of the/for/of/of general] content | Providing a storage location for content associated with a sub-region or local area ***and handling requests for content not stored in that location***.  *See* Exh. A, Defendants' Presentation at 73. |
| provid[ing/e] a second level of caching [of the/for/for the general] content | Providing a storage location for content associated with the regional server ***and handling requests for content not stored in that location***.  *See* Exh. A, Defendants' Presentation at 73. |

### 1.    The Intrinsic Evidence Supports Defendants' Construction

The plain meaning of caching requires more than storage—it requires functionality to handle what is known as a "cache miss," *i.e.,* if the requested content is not in that location, it has to go and get it.  The patent specification confirms this plain meaning of caching.  *See, e.g.,* '571 Patent at Fig. 11; 11:46-48 ("Otherwise, the caching server 402 forwards the request to the regional server 302 at the 'nearest' (i.e., most directly connected) regional data center 118.").  Figure 11 of the patents-in-suit vividly illustrates this concept.  *See* Exh. A, Defendants' Presentation at 55-60.  And as the Court will recall, the reference to "cache storage" in Figure 6 of the patents-in-suit lays to rest any notion that "storage" and "cache" mean the same thing, as Plaintiff's initial construction would have the Court hold.  *See id.* at 61.



Excerpt of Fig. 6 of the '571 Patent.

Although Plaintiff now inexplicably declines to agree to any part of Defendants' proposed revised construction, counsel for Plaintiff acknowledged—indeed, *argued*—at the Markman hearing last week that caching is more than just storage and that it must handle a cache miss.  *See, e.g.,* 12/10/12 Hrg. Tr. at 11:9-14. ("The cache can't contain everything.  When the song is not in the cache, the cache requests the song from the source. . . . The cache doesn't need to do anything on a miss besides pass on the request and the data.").

2.      **The Extrinsic Evidence Overwhelmingly
Confirms That Defendants' Proposal Is Correct**

Each person who has testified in this case about caching confirmed that caching requires

more than storage and that it must handle a cache miss.  Select portions of this testimony are as

follows:

–   Inventor, Milo Medin: "So a cache is, typically, demand based, so that is to say I go to this
    URL, the cache doesn't have a copy, so it goes out to the internet and fetches it, makes a
    copy as it sends that data back down to the user."  Exh. A, Defendants' Presentation at 62,
    citing Medin Tr. at 195:21-196:4.

–   Computer Science Professor Dr. Jeffay: "a person of ordinary skill in the art as of the alleged
    dates of invention would understand that the patents-in-suit disclose the traditional form of
    hierarchical caching wherein in response to a request by an end-user system, a first-level
    cache pulls (requests and receives) content from a second-level cache on a cache-miss (*i.e.,*
    when the requested data is not found in the cache)." Dkt. 131-3, Jeffay Decl. ¶ 80.

–   Patent Draftsman, James Okamoto: "Q: What's your understanding of what more would be
    needed beyond just storage to make it a cache?  A: It would have to do caching."  Dkt. 131-8,
    Okamoto Tr. at 44:12-17.

–   AtHome Engineer, Warren Van Camp: "I would expect cached content to be coming from
    somewhere else and stored temporarily, while stored content would be stored wherever it was
    stored." Dkt. 131-5, Van Camp Tr. at 29:10-16.

–   AtHome Network Designer, Dan McKernan: "It will provide you current, if it has it.  If not,
    it will fetch it for you."  Dkt.131-6, McKernan Tr. at 60:15-17.

*See also* Exh. A, Defendants' Presentation at 62-66.

Plaintiff's primary criticism of Defendants' original proposed constructions centered on

the "pull" language in those constructions.  Plaintiff argued that extrinsic evidence includes

theoretical proposals for augmenting traditional caching techniques with "push" caching, and

Plaintiff asserted that Defendants' constructions would exclude push caching.  *See* Dkt. 136-5,

Korkea-aho Thesis; Dkt. 135, Plaintiff's Reply Claim Construction Br. at 9-10; 12/10/12 Hrg. Tr.

at 13:3-6.  While Defendants do not concede that Plaintiff's argument concerning other methods

of caching is correct in the context of the patents-in-suit, the dispute is unnecessary and

completely beside the point.  Defendants' current proposal is not directed to or limited to push or pull caching, but rather focuses on the essential feature of caching of forwarding the request to another server on a cache miss (regardless of whether it takes place in a push or pull caching system).  As all of the evidence submitted by both Plaintiff and Defendants establishes, any cache, however configured, must be capable of handling requests for content not stored in that cache.  *See* Dkt. 136-5, Korkea-aho Thesis; Exh. A, Defendants' Presentation at 69.  By making the proposed construction amenable to all forms of caching, whether disclosed in the patents or not, Defendants eliminate the debate altogether and offer a construction supported by all evidence and argument submitted by the parties.  Unlike Plaintiff's original proposal or the Court's preliminary proposal, Defendants' revised construction gives the jury the guidance it will need to decide the issues in this case.

For the reasons set forth above, the Defendants respectfully request that the Court adopt Defendants' revised proposals for the caching terms.

**B.     Replication of Content "*Amongst* the Regional Servers"
       _– Not "To" or "Onto" the Regional Servers_**

The term "where content is replicated amongst the regional servers" appears in claim 10 of the '571 Patent.  For this term, the sole issue in dispute is whether the word "to" or "onto" should replace the word "amongst."  There is no legal basis for such a substitution.  Indeed, it is impermissible:  A proper claim construction cannot ignore the word that the patentee, himself, chose in drafting the claim at issue and that was part of the claim as allowed by the U.S. Patent and Trademark Office.  *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) ("Because the patentee is required to 'define precisely what his invention is,' . . . it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'").

Defendants propose an alternative construction for this term, as shown in the chart below. This construction captures the meaning of the term "amongst" as that term is commonly understood (*e.g.*, "talk amongst yourselves"):

| Term to be Construed | Defendants' Proposed Construction |
|---|---|
| content is replicated amongst the regional servers | Content is copied from one or more regional servers to other regional server(s)[2] |

The plain words of the claim support Defendants' proposed construction, as does other intrinsic evidence.  For example, Figure 12 provides the following guidance:



*See* '571 Patent at Fig. 12; 12:39-43.  *See also* Exh. A, Defendants' Presentation at 120.

This specification excerpt equates replicating content "amongst" the regional servers with replicating content "from the regional server to other regional servers"—just as  Defendants' proposed construction, common sense, and plain and ordinary meaning require.  Moreover, the specification recognizes that replication from a central server *to* a regional server is different from replication *amongst* regional servers, *see* '571 Patent at 8:41-42 ("files may be replicated

---

[2] Defendants are also amenable to the following construction: "Content is copied among the regional servers," which was presented as an option at the *Markman* hearing.  12/10/12 Hrg. Tr. at 141:16.

via replication from the central server 703 *and* amongst the regional servers 302") (emphasis added)—as the Court observed during the *Markman* hearing.  *See* 12/10/12 Hrg. Tr. at 134:1-137:1.

Plaintiff relies heavily on the word "replication" as described in the specification to criticize Defendants' proposed construction.  But there is no dispute as to the meaning of the word "replication."   The focus of this dispute is on the word "amongst," and the patent specification recognizes the difference between "replication *from* the central server" and replication "*amongst* the regional servers."   *Id*.   Only the latter form of replication is referenced—verbatim—in the disputed claim term, which is only a small, discrete part of one claim.  Plaintiff's criticism fails to address the dispute between the parties altogether.  In essence, Plaintiff says, "I don't like what Defendant says, so let's just remove 'amongst' from the claim language and replace it with 'to.'"  He offers no legal or evidentiary basis for this sleight of hand, and, indeed, there can be none.

Read in the context of all of the intrinsic evidence,[3] the phrase "content is replicated amongst the regional servers" is directed to replication from one or more regional servers to other regional server(s), once it is obtained from the central server.  In other words, it refers to replication at a peer-to-peer level, across or "among" the regional servers, all at the same level of the network hierarchy.   This concept, which acknowledges the patentee's use of the term "amongst," is captured by Defendants' proposed construction.

---

[3] The extrinsic evidence confirms that Defendants' proposed construction is correct.  *See, e.g.,* Exh. A, Defendants' Presentation at 121 (quoting Webster's II New College Dictionary (1995) (defining "amongst" as, *inter alia*, "[i]n the group," "[w]ith one another <arguing amongst themselves>")).

C.     **In the Context of the Invention, "Content"**
       **Means "Public Network-Accessible Files"**

The term "content" appears in all independent claims, as well as numerous dependent claims.  For this term, the principal dispute is whether the construction should exclude the specification's express limitation of "content" to files accessible via the public network.  Defendants' proposed construction accurately captures the scope of the actual invention.

| Term to be Construed | Defendants' Proposed Construction |
| --- | --- |
| content | Public network-accessible files |

1.     **The Intrinsic Evidence Supports Defendants' Construction**

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which [it] appears, but in the context of the entire patent, including the specification."  *Energy Transp. Grp., Inc. v. William Demant Holding A/S, WDH Inc.*, 697 F.3d 1342, 1351 (Fed. Cir. 2012).  Here, the *only* evidence before the Court of the plain meaning to a person of ordinary skill in the art is the Declaration of Dr. Kevin Jeffay.  *See* Dkt. 131-3, Jeffay Decl. ¶¶ 125-135 (stating that a person of ordinary skill in the art at the time of the alleged invention would have understood "content" in the context of the patents to be in the form of files and to be accessible via a public network).

"Content" is used consistently throughout the patents-in-suit to refer to public network-accessible files.  For example, Figure 1 shows that the origin of the "content" is the "public Internet (top portion) **170** . . . . "  *See* '571 Patent at Fig. 1; 3:55-57.  Similarly, the Background of the Invention section details "weakness[es] of the Internet."  *See id.* at 1:43-2:8.  That the "content" is "publicly accessible" is further supported by the hand-drawn version of Figure 1

submitted by the inventor with his original patent application, which expressly labeled the "remote source" of all content as "public Internet":



*See* '571 file history, 3/5/1997 Original Drawings (Figure 1).

Indeed, the patents themselves describe "the invention" as follows:  "***In the architecture of the present invention***, the distributed public Internet (top portion) 170 is separated from a hierarchical private network (bottom portion) 180 under private control."  *See* '571 Patent at 3:54-57 (describing Fig. 1) (emphasis added).  Such characterizations of "the invention" or the "present invention" have been found to be binding on the patentee.  *See, e.g., Bell Atlantic Network Services, Inc. v. Covad Comm. Group, Inc.*, 262 F.3d 1258, 1273-74, 1277 (Fed. Cir. 2001); *Edwards Lifesciences LLC v. Cook Inc. et al.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009)

("Here, the specification frequently describes an 'intraluminal graft' as 'the present invention' or 'this invention,' indicating an intent to limit the invention to intraluminal devices."). Thus, contrary to Plaintiff's assertions, Defendants' construction is not just lifted from the preferred embodiments; rather, delivering public network-accessible content *is* "the invention."

In the patents-in-suit, "content" is also consistently used to mean only files. *See* '571 Patent at 8:39-42 ("The multimedia content is served in the form of html, vrml, image, audio, and video files, or may be in other forms. ***These files*** may be updated via replication from the central server 703 and amongst the regional servers 302.") (emphasis added). The use of the "[t]hese files" in the second sentence confirms that the multimedia content described are all in the form of files – e.g., html, vrml, image, audio, and video files, or other *file* forms. *See also* '571 Patent at 9:20-26 ("If the requested *file* is contained in the cache storage 616, then the proxy server 621 sends the *file* from the cache storage 616 to the requesting end-user system 124. The caching module 622 stores recently-served *files* in the cache storage 616.") (emphases added).

## 2. Plaintiff's Attempts to Rebut Defendants' Construction Are Meritless

Plaintiff unsuccessfully tries to rebut Defendants' construction by raising several arguments—some of which were raised for the first time at the Markman Hearing—that are unsupported and should be rejected.

First, Plaintiff argues that "content" should not be limited to "public-network accessible" files because certain dependent claims require the high-speed backbone to be "coupled to the Internet." However, this additional limitation merely narrows the scope of the dependent claims from all "public networks" to the "Internet"—a specific "public network" that is defined by certain communications protocols and managed by the Internet Corporation for Assigned Names and Numbers (ICANN).

Second, Plaintiff argues that, according to the patents, some files may be pulled using a "short-cut" between the private backbone and a particular LAN 114, rather than going through the Internet. *See* Dkt. 135, Plaintiff's Reply Claim Construction Br. at 7 (citing '571 Patent at 4:65-5:1). But this does not alter the fact that the retrieved "content" is public network-accessible. For example, CNN files are still public network-accessible files, regardless of whether a short-cut is used to pull the data into the private network more quickly. *See, e.g.*, '571 Patent at 4:59-5:2 (describing a "short-cut" to a particular LAN 114 which, for example, houses a server for the ESPN SportsZone site).

Third, Plaintiff argues that "content" in the context of the patents cannot be limited to publicly accessible network files because of certain references to "off-net tailsites" in a Request for Proposal that Mr. Medin allegedly distributed to third parties in 1996.[4] According to Plaintiff, "[c]ontent providers can be tailsites," and "At Home users can access the content not on the Internet as a benefit of practicing the invention." *See* 12/10/12 Hrg. Tr. at 156:16-23. As an initial matter, "off-net tailsites" is not a term of art, and Plaintiff has offered no evidence as to how a person of ordinary skill in the art would understand the term from the disclosures in the Request for Proposal. Further, the patents themselves do not ever mention, let alone claim, "off-net tailsites." Instead, the patents specifically state that the content from "the present invention" originates from the public Internet. *See* '571 Patent at 3:54-57, Fig. 1.

Finally, Plaintiff argues that "content which is customized per region or locality is available only to users in that region or locality, not the general public." *See* 12/10/12 Hrg. Tr. at

---

[4] Plaintiff raised this argument for the first time at the *Markman* Hearing.

155:14-18.[5]  However, the fact that the claimed "content" is later "customized" does not change the fact that the content originated from the public network.

For the reasons set forth above, Defendants respectfully request that the Court adopt their proposed construction for "content."

## D. The Construction of "Multicast[ing]" Should Not Cover Broadcasting

The term "multicast[ing]" appears in all independent claims, as well as several dependent claims.[6]  Given that both parties and the Court agree that multicasting involves having only a single copy of the content passing over any network link, the primary dispute is whether the construction of multicast[ing] should distinguish broadcasting.  Defendants' proposed construction correctly captures the fact that a person of skill in the art would know that multicast is distinct from broadcast.[7]

| Term to be Construed | Defendants' Modified Proposed Construction |
|---|---|
| multicast[ing] | the delivery of content from a single source to multiple destinations **that requested to join the multicast group**, where only a single copy of the particular content passes over any network link |

### 1. Plaintiff Has Admitted That Multicast Is Distinct From Broadcast

Plaintiff admitted that broadcast is distinct from multicast in its interrogatory responses.

In attempting to distinguish two pieces of prior art, the Plaintiff stated:

> The distribution mechanisms disclosed are not multicasting, because all end-user systems connected to a neighborhood node receive the requested content. ***In 'multicasting' requested content is sent only to a subset of end-user systems that have subscribed***.

---

[5] Plaintiff similarly raised this argument for the first time at the *Markman* Hearing.

[6] "Multicast[ing] appears in dependent claim 13 of the '571 patent, as well as in claims 4, 10, and 16 of the '856 and '747 patents.

[7] Multicast is also distinct from unicast, but this is undisputed and already captured in the Court's initial proposed alternative construction.

*See* Exh. B, Plaintiff's Supplemental Responses and Objections to Interrogatory Nos. 11 &
17B/C in Verizon's Third Set of Interrogatories to Plaintiff (Nos. 11-25) (dated Nov. 16, 2012) at
138-139 (emphasis added).   In the context of another prior art reference, the Plaintiff further
stated, "Hoarty ***does not disclose multicasting***.   In Hoarty 'the data is in turn ***broadcast*** to nodes
for access by individual home interface controllers'."   *See id*. at 96 (emphases added).

Plaintiff's characterization of the distinction between multicast and broadcast is
consistent with the evidence – the inventor's deposition testimony, extrinsic sources, and Dr.
Jeffay's declaration of the plain meaning to a person of ordinary skill in the art all agree.  *See,
e.g.*, Exh. A, Defendants' Presentation at 93-96.

### 2.   Recipients' Requests to Join Multicast Groups Distinguish Multicast From Broadcast

The issue remains of how best to capture in the claim construction the distinction
between multicast and broadcast, in particular, the question of how to convey the action of
joining a multicast group.   In exploring the concept of multicast groups in the context of "group
of end user systems," the Court used the analogy of a customer walking into a store to illustrate
the self-selection process involved in a system joining a multicast group.   That is an accurate
analogy:   essentially, an affirmative act must be performed to indicate interest (either interest in
the products in the store or interest in the data that will be sent to a particular multicast address).
*See* 12/10/12 Hrg. Tr. at 171:22-172:8.   The Plaintiff concurred with this analogy.   *Id*.   And it is
this affirmative act – this joining of a group – that differentiates multicast from broadcast.   When
content is broadcast, every possible recipient receives the content – no act by the recipient is
required to receive the data.

Plaintiff, through attorney argument, attempted to obfuscate the issue by referencing for
the first time at oral argument "XCAST" and "IRC," claiming that those two protocols

demonstrate that requests to join multicast groups are not required for multicasting.  Again, Plaintiff has offered no evidence as to how a person of ordinary skill in the art would understand these protocols.[8]  Not only would a person of skill in the art not consider either of those protocols to be multicasting, but the Plaintiff was inaccurate in saying that no request is involved.[9]  Plaintiff's other brand-new theory based on RFC 1112 was similarly flawed for the same reason.[10]  Dr. Jeffay was clear that, to a person of ordinary skill in the art, it was understood that multicast requires requests to join a multicast group.

While several terms were used in the briefing and at the hearing to describe the concept of joining a multicast group, describing the affirmative act as a "request" is least likely to cause juror confusion.  Other terms, such as "tune in" and "subscribe," have connotations that are not compatible with the use of multicasting.  Tuning-in, for example, is commonly associated with broadcast television, where all content is sent to a television, but only a single program is viewed by tuning to the appropriate channel.  In multicast, by contrast, the content only comes after it has been requested.  Subscribe has a similar issue; as the Plaintiff points out, it is used in a different way in the patent, indicating a customer's subscription to a service.  In multicast, the request is not merely requesting to be a customer, but is instead more accurately described as subscribing to a multicast group to receive particular content.

---

[8] Indeed, at the *Markman* Hearing, Plaintiff was unable even to explain the relevance of these protocols.  *See* 12/10/12 Hrg. Tr. at 123:23-124:8.

[9] Plaintiff's inaccuracy is likely due to the fact that the argument is not based on the expert declarations or testimony elicited in this case.

[10] Plaintiff mischaracterized RFC 1112.  RFC 1112  does require the recipients to request to join the multicast group prior to receiving data.  *See, e.g.,* Dkt. 106-17, RFC 1112 at 7 ("However, before any datagrams destined to a particular  group can be received, an upper-layer protocol must ask the IP module to join that group.")

To that end, Defendants propose a modified version of the Court's proposed alternative construction, with the addition of the language "that requested the content" needed to differentiate broadcasting.   This construction captures the plain meaning of the term "multicast[ing]" as it would be understood by a person having ordinary skill in the art.

**E.**     **"Destination Address" Identifies a Multicast Group**

The "destination address" term appears only in claims 1 and 5 of the '275 patent.  The primary dispute is whether the construction should be limited to the context of multicast groups, or whether it should be broader and cover other addresses, such as unicast addresses. Defendants' proposed construction, based on the Court's proposed alternative construction, incorporates the Court's suggestions at the *Markman* hearing that were made to capture the multicast group concept, as this term is consistently described in the claims and specification. 12/10/12 Hrg. Tr. at 131:23-132:12.

| Term to be Construed | Defendants' Proposed Construction |
|---|---|
| destination address | Address identifying network location through which multicast content is delivered to requesting end-users |

**1.**     **The Destination Address identifies a group, not a particular location**

As an initial matter, the parties agree on certain aspects of the meaning of "destination address."   The parties agree, as does the Court based on comments at the hearing, that a destination address is not a location.[11]   Rather, destination address, as used in the patent, is an identifier that is used by the routers to guide the information to the destinations that are part of the multicast group.  If the router can be thought of as a postal worker, the destination address is the information on an envelope that is used to route mail.  And, because the destination address

---

[11] 12/10/12 Hrg. Tr. at 126:25-127:2, 169:10-18.

is a "multicast" address, the address identifies a logical group (e.g., a group like "U.S. District Court Judges"), not a particular location (as if it were a unicast address).

This understanding is consistent in the specification and the claims. For example, the claims refer to "the multicast content assigned to be multicast to a destination address."[12] The Plaintiff acknowledges this in his objection that it would be redundant to include multicasting in the term itself, since it is clear from the claim that it must be a multicast address. 12/10/12 Hrg. Tr. at 120:20-23. While Defendants agree that the claims and specification make clear that destination address is a multicast address, it is not redundant given that if the term were allowed to read on unicast addresses, as suggested by the Plaintiff, such a resulting system would not be functional, and would be inconsistent with the patents.

With the understanding that "destination address" is a "multicast" address, the final detail of the construction concerns how to express the meaning of the multicast address's identification of a multicast group. As previously discussed, the notion of a multicast group being formed by the recipients "requesting" most accurately describes the concept and avoids juror confusion. To that end, guided by the Court's suggestions, the construction proposed above captures the meaning of a "destination address," and is consistent with the patent specification and claims.

F.     **"Group of [the] End User Systems" Refers to
       <u>End User Systems that Requested the Content</u>**

The term "group of [the] end user systems" appears in claims 1, 10, and 11 of the '571 Patent and claims 1 and 5 of the '275 Patent. For this term, the principal dispute is whether, contrary to the disclosure in the specification, the term should include recipients that did not

---

[12] The specification is equally clear. In the only passage addressing destination address, that specification states, "[t]he process 1300 in FIG. 13 begins by assigning 1302 the content to be multicast to an IP multicast destination address." '275 Patent at 13:24-25.

request the content.  Defendants' proposed construction correctly captures the plain meaning of the term to a person of ordinary skill in the art.

| Term to be Construed | Defendants' Proposed Construction |
|---|---|
| group of [the] end user systems | end-user systems that requested the content |

Here again, the proper inquiry is the meaning of the term to a person of ordinary skill in the art when read not only in the context of the particular claim but in the context of the entire patent.  *Energy Transp. Grp., Inc.*, 697 F.3d at 1351.  Here, as with the other disputed claim terms, the *only* evidence before the Court of the plain meaning to a person of ordinary skill in the art is the Declaration of Kevin Jeffay.  *See* Dkt. 131-3, Jeffay Decl. ¶ 122 (stating that a person of ordinary skill in the art would understand that the groups of end-user systems are simply end user systems that *requested* the content that is either multicast or cached).  Plaintiff has no evidence of alleged plain meaning to the contrary.

The Court's proposed alternative construction is: "end-user systems that requested or otherwise subscribed to the content."  Although this encompasses the plain meaning of the term, the phrase "or otherwise subscribed to the content" injects potential ambiguity.  Indeed, any legitimate activity denoted by "or otherwise subscribes" would presumably be covered by the term "requested."  Therefore, Defendants respectfully request that the Court adopt their proposed construction for "group of [the] end user systems."

## III.   CONCLUSION

Defendants therefore respectfully request that the Court adopt Defendants' proposed claim constructions.

Respectfully submitted,

DATED:  December 20, 2012


By:   _/s/ David B. Bassett_____          By:   /s/ Jennifer C. Tempesta_____
David B. Bassett (DB-8727)                      Robert L. Maier
WILMER CUTLER PICKERING HALE AND                Jennifer C.Tempesta
        DORR LLP                                **BAKER BOTTS L.L.P.**
399 Park Avenue                                 30 Rockefeller Plaza
New York, NY 10022                              New York, New York 10112
david.bassett@wilmerhale.com                    Tele:  (212) 408-2500
Phone: (212) 230-8800                           Fax:   (212) 259-2500
Fax: (212) 230-8888                             robert.maier@bakerbotts.com
                                                jennifer.tempesta@bakerbotts.com
William F. Lee (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND                Bryant C. Boren, Jr.,
        DORR LLP                                (Admitted *pro hac vice*)
60 State Street                                 Kevin E. Cadwell
Boston, MA 02109                                (Admitted *pro hac vice*)
Phone: (617) 526-6556                           **BAKER BOTTS L.L.P.**
Fax: (617) 526-5000                             620 Hansen Way
                                                Palo Alto, California 94304
Caren K. Khoo (CK-2972)                         Tele:  (650) 739-7501
Olubukola Aina (admitted *pro hac vice*)        Fax:(650)739-7601
VERIZON CORPORATE RESOURCES GROUP LLC           kevin.cadwell@bakerbotts.com
One Verizon Way                                 bryant.c.boren@bakerbotts.com
Basking Ridge, NJ 07920
Phone: (908) 559-5623                           Kurt M. Pankratz
Fax: (908) 766-6974                             (Admitted *pro hac vice*)
                                                **BAKER BOTTS L.L.P.**
     *Attorneys for Defendants Verizon*         2001 Ross Avenue
     *Communications Inc., Verizon Services*    Dallas, Texas 75201
     *Corp., Verizon Corporate Resources*       Tele:  (214) 953-6500
     *Group LLC, Verizon Data Services LLC,*    Fax:   (214) 953-6503
     *and Verizon New York Inc.*                kurt.pankratz@bakerbotts.com

                                                *Attorneys for Defendants*
                                                *AT&T Inc., AT&T Operations, Inc. and*
                                                *AT&T Services, Inc.*